2022 IL App (1st) 210610-U

SIXTH DIVISION
May 20, 2022

No. 1-21-0610

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| GEORGE A. MOORE, as Special Administrator of the Estate of Decedent, James Moore, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | Appeal from the Circuit Court of |
| v. | ) ) | Cook County. |
| HAMMES PARTNERS d/b/a Hammes Realty Advisors, LLC d/b/a Hammes Partners St. Joseph ACC, LLC; PRESENCE ST. JOSEPH HOSPITAL; PRESENCE CENTER FOR ADVANCED CARE; POWER CONSTRUCTION COMPANY, LLC; and MATS, INC., | ) ) ) ) ) ) | No. 18 L 006865 |
| Defendants, | ) ) | The Honorable Mary R. Minella, |
| (Hammes Partners d/b/a Hammes Realty Advisors, LLC d/b/a Hammes Partners St. Joseph ACC, LCC, Presence St. Joseph Hospital, Presence Center for Advanced Care, and Power Construction Company, LLC, Appellees). | ) ) ) ) ) ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Justices Harris and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Where no evidence was presented to show that any act of a defendant proximately caused plaintiff's injuries, the circuit court properly granted summary judgment and dismissal in favor of defendants.

¶ 2    On July 2, 2016, James Moore was injured when he tripped and fell in front of the Presence Center for Advanced Care (PCAC). Mr. Moore sued multiple defendants, including the management company that owned the PCAC, the hospital that leased space within the PCAC, and the general contractor in charge of building the PCAC. Mr. Moore died in 2018, and his son, George Moore, was appointed special administrator of Mr. Moore's estate (the Estate). In January 2021, the circuit court granted defendants' motions for summary judgment and to dismiss, finding that the Estate was unable to put forward evidence that any act of a defendant proximately caused Mr. Moore's fall. No one witnessed the fall, and Mr. Moore died without his deposition having been taken.

¶ 3    On appeal, the Estate argues that there was sufficient evidence to create a genuine issue of material fact as to whether defendants' negligence proximately caused Mr. Moore's fall, and the court improperly granted defendants' dispositive motions. For the following reasons, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5                          A. The Complaint and Dispositive Motions

¶ 6    On July 2, 2018, Mr. Moore filed his initial complaint, alleging both negligence and vicarious liability against the following defendants: Hammes Partners d/b/a Hammes Realty Advisors, LLC d/b/a Hammes Partners Saint Joseph AAC, LLC (Hammes); Presence St. Joseph Hospital (Presence Hospital); and the PCAC. On September 17, 2018, Mr. Moore died from cerebral vascular disease. Mr. Moore's son, George Moore, was appointed special administrator of his father's Estate on April 25, 2019.

¶ 7    On December 27, 2019, the Estate filed the operative second amended complaint against Hammes, Presence Hospital, and the PCAC, and added Power Construction Company, LLC (Power Construction) and Mats, Inc (Mats). Mats—the subcontractor that the Estate alleged in the

complaint was hired to install an exterior grated hydronic floor in front of the PCAC—was dismissed from the case by the circuit court on September 1, 2020, and is not a party to this appeal. We will refer to Hammes, Presence Hospital, the PCAC, and Power Construction collectively as "defendants."

¶ 8 According to the operative complaint, the PCAC was a "newly built expansion project for outpatient care and services that became included [*sic*] a 380,000-Square foot ambulatory care center that opened September 2015." The Estate alleged that Presence Hospital "owned, held in public trust, controlled and/or maintained the building floor and walkways" of the PCAC, that Hammes retained Power Construction as the general contractor for the building of the PCAC, and that Power Construction contracted with Mats to install the hydronic floor.

¶ 9 With respect to how Mr. Moore fell, the Estate alleged:

"[O]n July 2, 2016, Plaintiff, JAMES MOORE, while walking into the facility at 331 W. Surf Street toward the in house pharmacy Walgreens, he violently tripped upon the metal grated decorative entry way, causing Plaintiff to fall to the ground with great force upon his face arms, legs and body.

*** That grated entry way creates a hazard by catching plaintiff's foot inside the grated openings and is not open and obvious to those entering and exiting its medical facility."

The Estate alleged claims of negligence against each defendant and a claim of vicarious liability against Presence Hospital.

¶ 10 On February 25, 2020, Presence Hospital and the PCAC (collectively, Presence) filed a joint motion for summary judgment, arguing that neither "owed a legal duty to maintain the entry way on which [Mr. Moore] allegedly fell," and that Presence Hospital could not be held vicariously

liable for the alleged negligence of Hammes.

¶ 11    Presence attached to its motion the depositions of Joe Stark, the regional construction manager for the company that runs the facilities at Presence Hospital; Kim Moody, a Hammes certified property manager who manages the PCAC; and George Moore. Both Joe Stark and Kim Moody testified that the PCAC was owned by Hammes, that Presence Hospital was a tenant that rented portions of the PCAC, and that per the lease Hammes was responsible for maintaining common areas of the PCAC, including the exterior plaza and entrance lobby. George Moore testified that he spoke to his father on the phone approximately one week after Mr. Moore fell, but that Mr. Moore only told George that he fell and had been hurt, without providing any specifics.

¶ 12    Based on these depositions and the lease, Presence argued that as a tenant of the PCAC, Presence Hospital had no duty to maintain the exterior of the PCAC where Mr. Moore was alleged to have fallen, and that the PCAC was not a legal entity but was instead simply the name of the building that Hammes owned and of which Presence Hospital leased a portion.

¶ 13    In response to Presence's motion, the Estate argued that Presence Hospital and the PCAC were "one in the same," and that summary judgment should be denied because "there will remain genuine issues of material fact as to what PCAC's role was to Walgreen's customers who enter through this entryway." The Estate largely relied on the depositions of Mr. Stark and Ms. Moody. In particular, the Estate relied on Ms. Moody's testimony that there had been complaints about the hydronic floor because "when there's any type of precipitation, moisture, snow, rain, it would be slippery." Ms. Moody testified to the contents of multiple e-mails about the hydronic floor, and said she worked for "months" to rectify the issue. Ms. Moody also said that the facilities managers between Presence Hospital and Hammes at the PCAC had a "[w]orking rapport."

¶ 14    Based on these depositions, the Estate argued that Presence "were landlords themselves of

Walgreens and multiple professional buildings on site. They had actual notice of the defect and failed to remedy it. The lease does not allow [Presence] Hospital to allow a dangerous condition upon their property."

¶ 15    Hammes filed its own motion for summary judgment on April 27, 2020, arguing that because Mr. Moore was not deposed before he died, there was no credible evidence of what caused him to fall, and thus nothing to tie an act of Hammes to his fall. Hammes relied on George Moore's deposition testimony that Mr. Moore never described the fall beyond saying that he fell and was hurt. Hammes argued that it was thus entitled to summary judgment because the Estate "can never prove proximate causation, as [Mr. Moore] never testified and the accident was unwitnessed. There is not and cannot be any evidence that any act by these defendants proximately caused the incident."

¶ 16    That same day, Power Construction filed a motion to dismiss pursuant to section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2020)), also arguing that the Estate could not prove proximate cause "as the decedent never testified and the accident was unwitnessed." Power Construction similarly pointed out that Mr. Moore did not tell his son, George Moore, anything specific about the fall beyond that it occurred and that he was hurt. Power Construction also argued it was entitled to summary judgment on the basis that it did not owe a duty of care to Mr. Moore, "as any work it did was pursuant to the architect's specifications and was completed and approved prior to the incident."

¶ 17    In response to Hammes's motion for summary judgment, the Estate argued that "summary judgment should be denied because the event was in fact witnessed and actual notice and evidence as to the hazardous condition of the grounds existed in advance of the fall," and that there was sufficient evidence giving rise to triable issues of material fact. The Estate argued that Hammes,

Mats, Presence Hospital, and Power Construction all had knowledge that the hydronic floor was a safety issue, again relying on the depositions of Mr. Stark and Ms. Moody.

¶ 18    In its response to Power Construction's motion to dismiss, the Estate argued that proximate cause was established because "there [wa]s reasonable certainty that the defendant's acts or omissions caused the injury," there was "evidence that the very grounds where defects were known to the owners, managers, contractors and subcontractors were in fact a fall risk," and that "the paramedics nearby witnessed the fall."

¶ 19    After these dispositive motions were fully briefed, on November 6, 2020, the Estate moved for leave to file a sur-reply to the motions so it could attach the deposition transcripts of two paramedics whom the Estate alleged "observed the incident where Mr. Moore fell, interviewed him and treated him."

¶ 20    On December 9, 2020, the parties argued the motion to dismiss and motions for summary judgment. The transcript for that court date is not included as part of the certified record on appeal, but a copy of the transcript is included in the Estate's opening appellate brief appendix. Thus, technically that transcript is not something for us to consider. But, since our review is *de novo,* the only portions of that transcript that matter to us on appeal are that the circuit court granted Presence's request to join in Hammes's motion for summary judgment and that the court indicated it would consider the paramedics' depositions. Both of those things are clear from other portions of the record, including the circuit court's written decision, issued January 4, 2021, that granted the defendants' motions.

¶ 21                      B. The Paramedics' Depositions

¶ 22    Both before the circuit court and now on appeal, the Estate relies on the paramedics as the only possible witnesses to Mr. Moore's fall. We thus summarize their depositions in some detail.

¶ 23    The paramedics—Herschel Gilbert and Michael O'Neill—both testified that at the time they treated Mr. Moore, they worked for a private ambulance company. On July 2, 2016, they were sitting in their ambulance in between calls on Commonwealth Street near the PCAC when an unidentified person flagged them down or knocked on the ambulance window and said that someone was on the ground, hurt, and in need of assistance. They walked over to where Mr. Moore was and, after evaluating and briefly treating his injuries, they transported him to the Presence Hospital emergency room.

¶ 24    Mr. O'Neill completed an ambulance report, which he testified about in his deposition. In pertinent part, the narrative section of that report provides:

> "Crew was sitting on Commonwealth Street when we were approached by a man stating that there was an older man that had fallen around the corner from our location that [ ]was being attended to by an employee of St Josephs Hospital. Crew walked over to man and found him lying in left lateral recumbent position in street infrom [*sic*] of the [PCAC]."

¶ 25    Mr. Gilbert remembered Mr. Moore as "a heavyset gentleman who seemed to have been laying on the ground ***." Mr. Gilbert said that Mr. Moore was injured on the bridge of his nose and complained of pain to his right knee. Mr. Gilbert said that he and Mr. O'Neill helped Mr. Moore into one of their chairs, then rolled him to the Presence Hospital's emergency room.

¶ 26    Mr. Gilbert repeatedly said he did not recall where Mr. Moore was when he and Mr. O'Neill approached him and did not see or know what had caused his fall. Specifically, when asked whether he had any conversations with Mr. Moore about how the fall occurred, Mr. Gilbert responded, "he had either potentially slipped on something on the sidewalk or had misplaced his footing on something that was—I'm sorry—not the sidewalk, but the street or it's where he was walking, whether it was part of the entranceway of the building or the area towards the street." Mr.

Gilbert said that he and his partner "did not witness the fall." Mr. Gilbert was also asked during his deposition if he recalled what ground Mr. Moore was on when they initially approached him, to which Mr. Gilbert said, "I believe he was closest to[,] might have been some pillars there. It was very close to an entranceway, sort of like dual opening doors. He wasn't at the doors. He was past the doors. I want to say closer to almost where the ground was raised a little bit, where it was nubbed so to speak." He also described the section of the ground Mr. Moore was found on as "a red raised roadway *** like the beginning of what a sidewalk would be." Later in his deposition, Mr. Gilbert again said that he did not remember where Mr. Moore was when the paramedics approached: "The only thing I remember about [Mr. Moore's] position is that he was on the ground. I remember seeing him. Outside of that, I'm not sure exactly where he was laying on the ground."

¶ 27    When shown a photograph of the front entrance of the PCAC, Mr. Gilbert said that Mr. Moore was "somewhere near the pillar. He would have been most likely on this beige area, I believe, closest—I mean he was in that general area, I believe." Mr. Gilbert further stated that Mr. Moore "was laying on the ground. I'm not too sure on where exactly he was in relation to that small area." Mr. Gilbert also said that Mr. Moore was not in the street. Later, Mr. Gilbert clarified further, explaining that Mr. Moore was not on the portion of the street that "normal traffic would have been on." As for Mr. Moore's position when they initially approached, Mr. Gilbert said he would "not exclud[e] anywhere from where the beginning of that curb starts all the way back to the entrance of the building."

¶ 28    Based on Mr. Moore's injuries, Mr. Gilbert said that he believed Mr. Moore suffered a "forward fall." As to what could have caused the 1/4-inch cut on Mr. Moore's nose, Mr. Gilbert said it "would have been some sort of edge that would have caused that, unless there was something

on the ground that was sticking up, but either way, an outside force or whatever would have caused that, had to have had some sort of sharper edge to it, possibly something on the sidewalk or the walkway area that would have done that." When looking at one of the pictures of the entranceway, Mr. Gilbert said that he saw "very many possibilities" for the cause of Mr. Moore's cut, "whether it would have been the raised sidewalk or one of the ribs in the red part of the sidewalk," or "a grate that was sticking up."

¶ 29    Mr. Gilbert could not recall anything specific about the person who he said flagged him and Mr. O'Neill down, but did not believe that person had said anything about how Mr. Moore fell.

¶ 30    On examination by counsel for Hammes and Power Construction, Mr. Gilbert agreed that he did not have any information as to how Mr. Moore came to be lying on the ground and could not specifically recall what surface Mr. Moore was on when he first approached. Finally, when questioned by counsel for Presence, Mr. Gilbert agreed that the potential causes he had mentioned for the cut on Mr. Moore's nose were purely speculation.

¶ 31    Mr. O'Neill, the other paramedic, described Mr. Moore as "an elderly gentleman" who "apparently had fallen." Mr. O'Neill said that a witness who saw Mr. Moore fall ran over to him and Mr. Gilbert and asked for help. Mr. O'Neill could not recall that person's name or what specifically was said, except that "Mr. Moore had fallen." Mr. O'Neill agreed that he wrote on the report that Mr. Moore was initially being attended to by an employee of Presence Hospital. He could not recall how he verified that information but said he would have either seen an employee badge or heard the person state they were an employee.

¶ 32    Mr. O'Neill said that once the unknown witness got their attention, he looked in the side mirror and saw "somebody laying on the ground." Mr. O'Neill and Mr. Gilbert walked over and

saw "a gentleman laying on the ground bleeding from—small little oozy blood from his nose, kind of laying on his left side, complaining of general pain, right knee pain," so the paramedics began to evaluate Mr. Moore.

¶ 33    Mr. O'Neill said that Mr. Moore was "situated on the sidewalk" when they initially approached, but he could not "recall exactly where." Mr. O'Neill agreed that if Mr. Moore had been in the street, they would have moved him, but did not remember doing so. Mr. O'Neill said that during the evaluation he did ask Mr. Moore what happened, but "[a]ll he said is that he tripped. He didn't specify why he tripped, how he tripped." Mr. O'Neill did not recall what material was beneath his feet when he was treating Mr. Moore.

¶ 34    When shown photographs of the PCAC entranceway, Mr. O'Neill said that, to his knowledge, he never walked on the metal grated portion, and that he could not recall Mr. Moore's exact location. Mr. O'Neill said that after he learned Mr. Moore had tripped, he did not observe anything that would pose a tripping hazard. Mr. O'Neill also said that he did not know what caused the cut on Mr. Moore's nose or even whether it signified a forward fall. The following exchange then occurred:

> "[Counsel for the Estate] Q. Well, he wouldn't have a nose laceration if he fell backward on his back, right?
>
> [Mr. O'Neill] A. In theory, no. but I don't even know if that laceration was due to this fall or if it was something from earlier in the day or what have you.
>
> Q. Okay. So are you saying that the nose cut, the knee swelling and the bleeding could have been from something other than him falling at or near the hospital?
>
> A. Of course, that's possible, but because I did not witness his fall, I can't make those kinds of determinations.

Q. Okay. The knee [*sic*] notes right knee swelling?

A. Yes.

Q. I guess same question, if there's a center laceration on the nose, right knee swelling, does this signify a forward trip or a forward fall?

A. It could, yes. But once again, because I did not visually witness his fall, I don't know."

¶ 35    When questioned by counsel for Hammes and Power Construction, Mr. O'Neill repeated that he had not witnessed Mr. Moore's fall and that the only knowledge he had as to why Mr. Moore fell was "[j]ust what Mr. Moore told [him], that he tripped." Mr. O'Neill did not know what surface Mr. Moore was on when he tripped.

¶ 36                    C. The Circuit Court's Ruling and the Motion to Reconsider

¶ 37    On January 4, 2021, the circuit court ruled orally, in front of a court reporter, on the defendants' motions. The court referenced that Presence was joining in the motion for summary judgment. The court then gave a detailed summary of the deposition testimony that the Estate had presented, concluding that the Estate "cannot establish proximate cause because [the Estate] cannot establish how Decedent James Moore fell. The fall was unwitnessed. Although [the Estate's] counsel argues that the paramedics witnessed James Moore's fall, there is no evidence to support this argument." The court stated that the deposition testimony of the paramedics was considered, but that the passages that counsel for the Estate relied on at oral argument "only referred to a man approaching the ambulance around the corner where the crew was sitting eating lunch and informed them that an older man had fallen." The court noted:

"There is no testimony from any witness, no Saint Joseph's Hospital employee or other person who witnessed James Moore's fall who can state where exactly [he] fell. Mr.

James Moore was found lying on the ground outside on the sidewalk. There was no evidence or witness testifying that Mr. Moore fell or tripped anywhere inside the entryway to [the PCAC] or anywhere on the metal grate decorative—metal-grated decorative entryway. There is no showing by plaintiff that any defendants' [*sic*] alleged negligence is the legal cause of Decedent James Moore's injuries."

¶ 38 Accordingly, the court granted summary judgment in favor of Hammes and Presence, and dismissal to Power Construction.

¶ 39 The court followed up on its oral ruling with a written order entered on January 12, 2021. That ruling stated:

"On the day of the occurrence, July 2, 2016, plaintiff's decedent James Moore was found on the ground outside the entrance to [the PCAC]; the incident was unwitnessed; James Moore's deposition was never taken before he died of an unrelated cause; there is no evidentiary support for plaintiff's argument before this court or for the allegations in plaintiff's second amended complaint at law that James Moore fell on the metal grated decorative entryway to [the PCAC]. Absent is any evidence of the cause of James Moore's fall; there is no genuine issue of material fact on the issue of proximate cause and summary judgment is granted in favor of all remaining defendants."

¶ 40 On February 11, 2021, the Estate filed a motion to reconsider the circuit court's order of January 12, 2021. In it, the Estate argued that the court "misapplied longstanding laws related to material fact, and unwitnessed accidents," and "ruled on matters not before [it], in an effort to dismiss the matter in its entirety." The Estate argued that the court's rulings were erroneous because genuine issues of material fact existed where "the event was in fact witnessed and actual notice and evidence as to the hazardous condition of the grounds existed in advance of the fall."

The Estate also argued that the court improperly "invited counsel for [Presence] to orally join arguments filed by Counsel for [Hammes] and Powers Construction, and matters not raised by counsel for [Presence]" which "allowed for disposal of all the issues and all of the defendants, without allowing Plaintiff an opportunity to file a response."

¶ 41    The circuit court denied the motion to reconsider. This appeal followed.

¶ 42                                II. JURISDICTION

¶ 43    The circuit court denied the Estate's motion to reconsider its ruling on the grant of summary judgment for Hammes and Presence and the dismissal of the suit against Power Construction on April 26, 2021. The Estate timely filed its notice of appeal on May 26, 2021. We have jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 44                                III. ANALYSIS

¶ 45    Before reaching the merits of the appeal, we briefly address defendants' arguments that the Estate's appellate brief should be stricken for failing to comply with multiple Illinois Supreme Court rules. It is true that "the Illinois Supreme Court rules are not suggestions; they have the force of law and must be followed." *Ittersagen v. Advocate Health & Hospitals Corp.*, 2021 IL 126507, ¶ 37. As such, where an appellant fails to comply with supreme court rules, we have the discretion to strike the brief and dismiss the appeal. *Alderson v. Southern Co.*, 321 Ill. App. 3d 832, 845 (2001). "However, [w]here violations of supreme court rules are not so flagrant as to hinder or preclude review, the striking of a brief in whole or in part may be unwarranted." (Internal quotation marks omitted.) *Sweet Berry Café, Inc. v. Society Insurance, Inc.*, 2022 IL App (2d) 210088, ¶ 30. While we admonish counsel for the Estate to avoid repeating these violations, which include relying on a transcript that is in its appendix but that has not been made part of the record

on appeal, the Estate's violations "are not so flagrant as to hinder or preclude review." *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 30. We will address the appeal on the merits.

¶ 46    On appeal, we are reviewing the circuit court's grant of summary judgment in favor of Hammes and Presence (see 735 ILCS 5/2-1005(c) (West 2020)), and its dismissal of the claims against Power Construction pursuant to section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2020)). "Summary judgment is proper when 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Bremer v. City of Rockford*, 2016 IL 119889, ¶ 20 (quoting 735 ILCS 5/2-1005(c) (West 2012)). Section 2-619(a)(9) allows for involuntary dismissal because "the claim asserted against [the] defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2020). We review both a grant of summary judgment and a section 2-619 dismissal *de novo*. *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 22 (summary judgment); *Smith v. Waukegan Park District*, 231 Ill. 2d 111 (2008) (section 2-619(a)(9) motion to dismiss).

¶ 47    The circuit court based its grant of both Power Construction's motion to dismiss and summary judgment in favor of Hammes and Presence on its determination that the Estate had failed to provide evidence that the act of any defendant proximately caused Mr. Moore's fall. The Estate's primary argument on appeal is that the circuit court erred in finding it had presented insufficient evidence of proximate cause to create a genuine issue of material fact. The Estate insists that there was sufficient evidence and that "[r]easonable inferences can be drawn to create triable issues of material fact, enough to deny summary judgment."

¶ 48    "In a negligence action, the plaintiff must plead and prove the existence of a duty owed by the defendant, a breach of that duty, and injury proximately resulting from that breach." *Bruns v.*

*City of Centralia*, 2014 IL 116998, ¶ 12. "To establish proximate cause, the plaintiff bears the burden of affirmatively and positively show[ing] that the defendant's alleged negligence caused the injuries for which the plaintiff is seeking to recover." *Berke v. Manilow*, 2016 IL App (1st) 150397, ¶ 34. " 'The occurrence of an accident does not support an inference of negligence, and, absent positive and affirmative proof of causation, [a] plaintiff cannot sustain the burden of establishing the existence of a genuine issue of material fact." *Kellman v. Twin Orchard Country Club*, 202 Ill. App. 3d 968, 974 (1990).

¶ 49    We have recognized:

> "Proximate cause need not be proved with direct evidence. [Citation.] Rather, causation may be established by facts and circumstances that, in light of ordinary experience, reasonably suggest that the defendant's negligence produced the plaintiff's injury. [Citation.] That said, proximate cause cannot be predicated on surmise or conjecture, and, therefore, causation will lie only where there exists a *reasonable certainty* that the defendant's acts caused the injury. [Citation.] If the plaintiff cannot identify the cause of his injury or can only guess as to the cause, a court cannot find the defendant liable for negligence." (Emphasis added.) *Barclay v. Yoakum*, 2019 IL App (2d) 170962, ¶ 9.

¶ 50    In this case, we agree with the circuit court that there was no evidence, either direct or circumstantial, that an act of any defendant proximately caused Mr. Moore's fall. Indeed, there was no evidence of what caused Mr. Moore's fall at all. Three of the deposed witnesses had no direct involvement in Mr. Moore's fall—neither Mr. Stark, Ms. Moody, or even George Moore saw the fall or spoke to Mr. Moore at any time on the day of the fall. There were only two witnesses deposed who *could* have had knowledge of the circumstances surrounding Mr. Moore's fall: the paramedics who evaluated and eventually transported him to the emergency room. However, by

their own testimony, neither Mr. Gilbert nor Mr. O'Neill saw Mr. Moore fall and neither could recall exactly what surface Mr. Moore was sitting on when they initially approached him. Both Mr. Gilbert and Mr. O'Neill repeatedly said that they did not witness the fall and did not know what caused Mr. Moore to fall. Mr. O'Neill specifically refused to speculate as to what caused Mr. Moore to fall, saying that "because I did not witness his fall, I can't make those kinds of determinations." And though Mr. Gilbert did suggest some possibilities as to the potential cause of Mr. Moore's fall, he acknowledged that those possible causes were purely speculation.

¶ 51    The Estate suggests on appeal that the circuit court did not consider the paramedics' depositions. However, the circuit court made quite clear that it did consider those depositions in coming to its conclusions. The depositions simply do not connect Mr. Moore's fall to the hydronic floor or provide any evidence that could help the Estate meet its burden of presenting some evidence as to proximate cause.

¶ 52    The Estate spends a great deal of its appellate briefs arguing that the hydronic floor was a dangerous condition of which all defendants had notice. In support, the Estate points to Ms. Moody's e-mail exchanges about rectifying the issues with the hydronic floor. But evidence that defendants were on notice of the danger is not enough to connect the dangerous condition—the hydronic floor—with Mr. Moore's fall. "No liability can exist unless the defendant's alleged negligence is the legal cause of the plaintiff's injury and if the plaintiff fails to establish the element of proximate cause, she has not sustained her burden ***." *Kimbrough v. Jewel Companies, Inc.*, 92 Ill. App. 3d 813, 817 (1981); see also *Berke*, 2016 IL App (1st) 150397, ¶ 41 (noting that the plaintiff's fall was not witnessed and that even the possible existence of a dangerous condition was "not sufficient to establish a causal connection between [the] defendants' alleged negligence and [the plaintiff's] injuries").

¶ 53    The Estate also takes issue with the circuit court allowing Presence to join Hammes's motion for summary judgment, arguing that "[t]his action allowed for disposal of all issues and all of the defendants, without allowing Plaintiff an opportunity to file a Response." But, as defendants point out, the Estate's failure to put forward evidence that Mr. Moore's injuries were proximately caused by the hydronic floor defeated the Estate's claims against all defendants. Moreover, the issue was fully briefed with respect to both Hammes's motion for summary judgment *and* Power Construction's motion to dismiss, and Presence did not raise any new arguments. That the circuit court allowed Presence to join Hammes's summary judgment motion was not only an exercise of its inherent authority to control its docket (*Sander v. Dow Chemical Co.*, 166 Ill. 2d 48, 65-66 (1995)), but a reasonable and efficient way to manage this case.

¶ 54    Most importantly, the Estate has failed to show any prejudice stemming from the circuit court's decision to allow Presence to join Hammes's motion. See *Premo v. Falcone*, 197 Ill. App. 3d 625, 629 (1990) (finding that, where the circuit court allowed two defendants to withdraw their answer and join in a third defendant's motion to dismiss, "[s]ince [the] plaintiffs did not suffer any prejudice by the withdrawal of an answer that had been filed only two weeks earlier, the [circuit] court did not abuse its discretion by allowing the withdrawal and permitting these defendants to join in [the third defendant's] motion to dismiss"). There was no abuse of discretion by the circuit court in its allowing Presence to join in the motion for summary judgment.

¶ 55    Finally, to the extent that the Estate is raising any argument about the court's granting of Mat's motion to dismiss, such an argument has no place in this appeal. Mats's motion to dismiss was granted on September 1, 2020, in an order wholly separate from the one granting summary judgment in favor of Hammes and Presence and dismissal in favor of Power Construction. The Estate did not list the order dismissing Mats as one being appealed, and Mats was not listed as a

party in the Estate's notice of appeal. Thus, Mats had no opportunity to respond to this appeal, and we disregard any arguments the Estate makes as to the dismissal of the claims against Mats.

¶ 56                                    IV. CONCLUSION

¶ 57     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 58     Affirmed.